IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

PIERRE A. MONTANEZ,
    Petitioner,

v.

JOHN BURLE, WARDEN,
    Respondent.

Case No. 1:21-cv-1293-JEH

**Order and Opinion**

Before the Court is Petitioner Pierre A. Montanez's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 9). Montanez is currently serving a life imprisonment sentence at Pinckneyville Correctional Center, after he was found guilty in Illinois state court of two counts of first-degree murder, aggravated kidnapping, and aggravated vehicular hijacking. He challenges his convictions, with the majority of his arguments centering around evidence he argues the State suppressed in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons below, the Court DENIES the Amended Petition and DECLINES to issue a certificate of appealability.

**I[1]**

**A**

In August 2002, Roberto Villalobos and Alejandra Ramirez were murdered. Villalobos was found in a pool of blood on a driveway in Chicago, Illinois, and, a

---

[1] Unless otherwise noted, the facts are taken from the undisputed facts in Respondent's Response (Doc. 16), which are consistent with the official records from Petitioner's state court proceedings, which Respondent attached to the response (Doc. 17). *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that

few miles away, Ramirez's body was found in a burned Chevy Caprice. Both bodies had multiple stab wounds. Montanez and codefendant Jose Luera were subsequently charged with the first-degree murders of Villalobos and Ramirez, aggravated kidnapping, and aggravated vehicular hijacking. Montanez and Luera were convicted of all charges at separate trials.

Montanez proceeded to trial in April 2012. *See* Doc. 17-7 at 25–34. The prosecution offered proof that Montanez was guilty as both a principal and an accomplice. Witness testimony pieced together what happened the night of the murder and provided evidence that Montanez and Luera were with the victims that night, that two perpetrators were involved, and that Montanez bought the gasoline used to burn the Chevy Caprice:

Anna Ortiz testified that she was at Luera's home in Chicago, Illinois, with Claudia Negrette, Luera, and Montanez on the night of the murders. Around 11:30 p.m., Villalobos and Ramirez picked up Negrette, Luera, and Montanez in Villalobos's gray Chevy Caprice. Ortiz and Negrette were then dropped off near Negrette's home, while Villalobos, Ramirez, Montanez, and Luera remained in the car.

Next, John McDonnell testified that he arrived at his Chicago home around midnight on the night of the murders. He was on his front porch, when he saw Villalobos climb out of the back window of a Chevy Caprice and call for help. Luera immediately climbed out of the same window. As Villalobos backed away, McDonnell saw Luera punch Villalobos in the face repeatedly until Villalobos collapsed. Luera continued punching Villalobos as he was on the ground trying to defend himself. McDonnell approached and told Luera to get off of Villalobos. He

---

the judge finds from the evidence that they are not true."). The factual determinations of the state court are presumed to be correct, unless a petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

2

was going to grab Luera, but paused because he saw a flash of light in the car that led him to believe there were more people in the car.

Around this time, Luera got up. Then, Villalobos, who was covered in blood, also got up and ran behind McDonnell and asked McDonnell for help. McDonnell and Villalobos backed up as Luera approached them holding a knife. McDonnell then ran behind his house and grabbed a two-by-four to use as a weapon. When McDonnell returned with the two-by-four, he saw the Chevy Caprice driving away. The front passenger door was open as it began to leave, then the door closed. McDonnell saw Villalobos laying on his driveway with multiple stab wounds. McDonnell called 911 and, the next day, identified Luera from a photo array.

The story of the night was continued by another witness: Jason Samhan. Samhan testified that he saw a gray Chevy Caprice shortly after midnight. The car had blood on its driver's side door, ran a red light, and almost hit Samhan's car. A woman's head was hanging out of the car window and a man was choking her from the back seat. Samhan saw that the woman was screaming and trying to fight back. Samhan called 911.

Another witness, George Hoyt, the night manager of a gas station, testified that around 1:45 a.m. Montanez came inside to purchase two cans of gasoline. Montanez had scratches on his face and neck. Montanez told Hoyt he needed the gas for his van because his girlfriend had run out of gas while at work and that his van was at a location that was just three blocks from the gas station. *People v. Montanez*, 2014 IL App (1st) 122369-U, ¶ 8. Hoyt explained that it would be cheaper to buy one can, fill up his van, and drive back to the station for more gas. Montanez still bought and filled two gas cans. Hoyt later identified Montanez in a photo array, and in a lineup as the person that purchased gas. *Id.* ¶¶ 12, 13.

Samson Murray, an acquaintance of Montanez, testified that he saw Montanez walk away from the gas station carrying two gas cans, then get into Nick Buogos' vehicle and leave.

The prosecution also presented police testimony. Police responded to McDonnell's 911 call shortly after midnight and found Villalobos lying dead in a pool of blood. He suffered at least 28 stab wounds. About two to three hours later, and roughly a mile from the gas station at which Hoyt worked, police found the Chevy Caprice. The vehicle had been doused with gasoline and set on fire. Charred debris inside the car contained gasoline. Police also found blood on the interior and exterior of the car. Ramirez's burned body lay on the back seat. She died from fourteen stab wounds and strangulation.

Illinois State Police forensic DNA analyst Amy Rehnstrom testified that Montanez's DNA profile was consistent with DNA found under Ramirez's fingernails. *Montanez*, 2014 IL App (1st) 122369-U, ¶ 10. She stated that "approximately one in [ten] quadrillion black, one in 18 quadrillion white, or [one] in 2.5 quadrillion Hispanic unrelated individuals cannot be excluded" as the contributor, so "you would have to add approximately six more zeros to the population of the earth to find one other person who can't be excluded from the DNA profile other than [Montanez]." *Id.* ¶ 11.

The lead detective on the case, Robert Lenihan, obtained arrest warrants for Montanez and Luera. Luera was arrested in California. Montanez went to the police station with two attorneys in November 2002. He admitted to being in a car with Villalobos and Luera, but not on the night of the murders. Montanez paused the interview after Lenihan told Montanez that the police knew he had brought gas to burn the Caprice. After conferring with his attorneys, Montanez said he needed the gasoline because he was in a car with Buogos and it ran out of gas.

At the time of the interview, Montanez also had visible burns on his left arm near his wrist and on his right leg. Montanez claimed that he had been burned on the Fourth of July. One of his attorneys gave Lenihan a prescription for a burn treatment cream and a note from "Dr. E. Cabrera" of the Highland Medical Center, which stated that he had treated Montanez for the burns. The parties stipulated at trial that Dr. Ernest Cabrera of the Highland Medical Center, would testify that (1) he had never treated Montanez; (2) he did not sign the letter that Montanez gave police; and (3) there were no other doctors named "Cabrera" at the medical center.

Montanez did not present any evidence. The jury found Montanez guilty of all charges: the first-degree murders of Villalobos and Ramirez, aggravated kidnapping, and aggravated vehicular hijacking. The trial court later sentenced him to life imprisonment for the two murders, a consecutive 27 year sentence for the aggravated kidnapping, and a consecutive 20 years for the aggravated vehicular hijacking.

## B

Montanez filed a direct appeal alleging that he was deprived of his constitutional right to a fair and impartial trial because of prosecutorial misconduct during closing arguments. Specifically, he alleged that the State misstated the evidence and asserted that there was evidence to establish motive and that Montanez's fingerprints were on Ramirez's neck. *Montanez*, 2014 IL App (1st) 122369-U, ¶ 19. The Illinois Appellate Court affirmed the judgment. *Id.* ¶ 25. Montanez filed a pro se Petition for Leave to Appeal (PLA) only arguing that his direct appeal counsel operated under a per se conflict of interest and was ineffective. The Illinois Supreme Court denied the PLA on May 27, 2015. *People v. Montanez,* 32 N.E.3d 677 (Ill. 2015).

## C

In December 2014, while his direct appeal was still pending, Montanez filed a *pro se* postconviction petition, which he supplemented with additional claims. Included were claims that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose (1) that Ortiz testified against Montanez in exchange for a plea deal in her pending criminal case; and (2) a Chicago Police Department (CPD) file found in the basement of a Chicago police station.

During the postconviction proceedings, Montanez presented evidence that Ortiz pled guilty to theft on May 17, 2012. Two notes from the prosecution's case file for Ortiz were disclosed as potentially relevant. *People v. Montanez*, 2021 IL App (1st) 191065-U, ¶ 28. The first note was undated and states:

> Call V, offer [right pointing arrow symbol] how do they feel about probation or robbery?
>
> D call [the assistant state's attorney in [Montanez's case] – atty says D is a witness in his murder and was reluctant to testify? D [Martinez or Montanez]?

The other note states:

> V's interviewed regarding a plea to theft for probation. V did not want to testify and is happy with that result—all witnesses concur and also did not want to testify per ASA.
>
> 5.11.12 Gaughan [triangle symbol] i/c @ w/attny
>
> Amend ct 1 to theft from person
>
> PG/JLD/PG – 14 mos prob
>
> ARG
>
> nolle pros remaining cts.

*Id.* The state circuit court eventually granted the State's motion to dismiss in August 2017, and denied Montanez's motion for reconsideration in November 2018. *Id.* ¶¶ 32–34.

Notably, the *Brady* claim based on the entire CPD file was included in his first amended postconviction petition that was filed in April 2016. In this filing, he attached a letter he had received from attorney Candance Gorman dated December 5, 2015, *People v. Montanez*, 234 N.E.3d 777, 800 (Ill. 2023), which indicated that Gorman found a Chicago police file related to Montanez's case, *Montanez*, 2022 IL App (1st) 191930, ¶ 20. However, Gorman informed Montanez that the files could only be turned over to an attorney. Montanez first alerted the trial court to Gorman's letter regarding the CPD basement file on May 2, 2018, after his petition had been denied but while Montanez's motion for reconsideration of his petition was pending:

> The parties and the trial court spent the next several months locating and reviewing the files and then litigating [Montanez's] access to the files. On May 21, 2018, the trial court stated that Gorman had the files and directed Assistant State's Attorney (ASA) Linda Walls to contact her. On June 28, 2018, the State represented that the basement files could only be obtained via subpoena. With [Montanez's] permission, the trial court directed the State to issue a subpoena returnable to the trial court. On July 31, 2018, ASA Walls stated that she had reviewed the basement files and compared the files to what was tendered to the defense pretrial. ASA Walls stated that one report was in a different format but that the exact content of that report was contained in a larger report. The trial court directed ASA Walls to turn that report over to [Montanez].

*Id*. Montanez "questioned the propriety of the State's review of the files as opposed to an in camera review by the trial court," but the trial court found " it trusted ASA Walls as an officer of the court that the only relevant document in the basement files was the one police report." Relying on the report, "[o]n September 17, 2018, [Montanez] filed a third amended petition for postconviction relief, raising a *Brady*

issue related to the police report. . . As these amendments were not sanctioned by the trial court, they were never ruled on" in his initial post-conviction petition. *Id.* ¶41, n.3.

On appeal, Montanez only argued that the prosecution violated *Brady* by failing to disclose that Ortiz had entered into a plea agreement in exchange for testifying against Montanez. The Illinois Appellate Court affirmed the denial of postconviction relief, agreeing that the claim was meritless. The Illinois Supreme Court denied Petitioner's PLA on September 29, 2021.

### D

While his first postconviction motion was on appeal, in April 2019, Montanez filed a motion for leave to file a successive postconviction petition. In this proposed postconviction petition, Montanez sought to bring a claim that the prosecution violated *Brady* by failing to produce the police report from the basement CPD file that provided McDonnell's account of Luera's attack. The trial court denied leave to file the successive petition.

On appeal, Montanez argued that he demonstrated cause and prejudice to file a successive petition as to two *Brady* claims: the prosecution's failure to disclose (1) the specific police report from the CPD files; and (2) the file in which the report was found (entire CPD file). The Illinois Appellate Court affirmed.

The Illinois Supreme Court allowed Montanez's PLA. *See People v. Montanez,* 234 N.E.3d 777 (Ill. 2023). Montanez only argued that he had shown cause and prejudice to raise the *Brady* claim relating to the entire CPD file in a successive postconviction. (He did not raise his claim related to the specific police report.) The Illinois Supreme Court rejected the claim on two alternate and separate grounds: First, the court found that Montanez had forfeited his claim because he failed to include it in his trial court filings. Second, Montanez had failed to show cause to raise the claim in a successive postconviction petition because he had

raised the *Brady* claim related to the entire CPD file in his *initial* postconviction petition, but abandoned the issue on appeal.

E

While Montanez's first motion for leave to file a successive postconviction petition was on appeal, he filed a second motion for leave to file a successive postconviction petition. This second motion for leave to file alleged that the prosecution violated *Brady* and *Napue v. Illinois*, 360 U.S. 264 (1959), when it (1) submitted the stipulated testimony of Detectives James Winston and William Tyrell that certain "collected debris" was determined to be gasoline when that debris pertained to someone else; (2) failed to disclose a laboratory report showing that "Caucasian hairs" were found on Ramirez's body; and (3) failed to disclose that Rehnstrom, the DNA analyst that testified at trial, had been disciplined for dishonesty. Additionally, the motion raised an ineffective assistance of trial counsel claim for (1) stipulating to Winston's testimony; (2) failing to investigate the "collected debris," and (3) failing to impeach McDonnell and Hoyt based on Winston's report. The trial court denied leave to file the successive postconviction petition.

On appeal, Montanez's appointed counsel moved to withdraw and filed a memorandum identifying potential issues for appeal and explaining why those issues lacked arguable merit. The Illinois Appellate Court concluded that there were no issues of arguable merit, granted counsel's motion to withdraw, and affirmed the trial court's judgment. The Illinois Supreme Court denied Montanez's subsequent PLA in March 2025.

F

Montanez initiated these proceedings in October 2021, by filing a Petition for Writ of Habeas Corpus 28 U.S.C. § 2254 (Doc. 1) with seven grounds for relief.

9

On January 28, 2022, Judge Joe Billy McDade dismissed the petition with leave to reinstate following the conclusion of Montanez's state-court proceedings. (Doc. 7).

In April 2025, following the Illinois Supreme Court's denial of his PLA for his second motion for leave to file a successive postconviction, Montanez filed an amended petition (Doc. 9), raising the following nine grounds for relief:

1) The prosecutors deprived Montanez of his right to a fair and impartial trial when, during closing argument, they misstated the evidence and asserted that there was evidence to establish motive and to establish that Montanez prints were on the decedent's neck, even though no such evidence was presented. (Doc. 9 at 18)

2) The state failed to disclose to the defense that its key trial witness Anais Ortiz testified with expectation of receiving a plea bargain in her own pending case (*id.* at 20);

3) The State failed to disclose to the defense: (a) a police report that would have impeached a key witness (McDonnell) and supported the defense theory that was found within the Chicago Police Department ("CPD") "street files"; and (b) the entire CPD street files, which potentially contained other *Brady* material that cannot be discerned until an advocate for Montanez is allowed access to the file" (*id.* at 22);

4) The State failed to disclose to the defense that Caucasian hairs were found on Ramirez's body. (*id.* at 25);

5) The state failed to disclose that Inventory No. 10021697 did not pertain to Montanez's case (*id.* at 28);

6) The State failed to disclose to the defense the Illinois State Police Investigation summary detailing Amy Rehnstrom's Acts of dishonestly in 2003, when she was working as a DNA analyst (*id.* at 31);

7) Montanez's right to confront the witnesses against him was denied when defense counsel agreed to stipulate to the testimony of defective James Winston (*id.* at 32);

8) Montanez's right to effective assistance of counsel was denied when counsel failed to impeach multiple witnesses (*id.* 9 at 32); and

9) Montanez's right to confront the witnesses against him was denied when the trial court allowed one doctor to present to the jury the contents of another doctor's certified autopsy report. (*id.* at 36).

Respondent filed a response in opposition (doc. 16), arguing grounds 1 and 9 are untimely, grounds 1 and 3 through 9 are procedurally defaulted, and that the state court's decision on ground 2 is entitled to deference. Montanez filed a timely reply. (Doc. 19). This order now follows.

## II

## A

Montanez's grounds 1 and 9 are untimely. A one-year statute of limitations that applies to federal habeas petitions challenging state court convictions. *See* 28 U.S.C. § 2244(d). The limitations period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*See* 28 U.S.C. § 2244(d)(1). The limitations period is ordinarily calculated under § 2244(d)(1)(A). *Mayle v. Felix*, 545 U.S. 644, 662 (2005). Under subsection (A), the relevant "judgment" is the date on which the conviction and sentence become final. *See Burton v. Stewart*, 549 U.S. 147, 156-57 (2007). However, the statute of

11

limitations is tolled during the pendency of a properly filed application for state postconviction relief. *See* 28 U.S.C. § 2244(d)(2).

When a petitioner raises new claims in an amended petition, Federal Rule of Civil Proceedings 15(c)(1)(B) provides that pleading amendments relate back to the filing date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." An amended petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650.

Montanez's conviction became final on August 25, 2015, ninety days after his direct appeal PLA was denied by the Illinois Supreme Court and the time to file a petition for a writ of certiorari expired. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). By this time, however, Montanez had already filed his postconviction petition in state court, which tolled the statute of limitations. *See* 28 U.S.C. § 2244(d)(2). The statute of limitations finally began to run on September 30, 2021, the day after the Illinois Supreme Court denied Montanez's postconviction PLA, and expired one year later on September 30, 2022. Montanez filed his original § 2254 petition well within this deadline on October 19, 2021. However, the grounds labeled 1 and 9 in Montanez's amended petition were raised for the first time in Montanez's amended petition in April 2025, over two years past the one year deadline.[2]

---

[2] Montanez's additional proceedings in state court litigating his first and second motions for leave to file a successive postconviction motion did not toll the statute of limitations. *See Martinez v. Jones*, 556 F.3d 637, 638–39 (7th Cir. 2009) ("[W]here state law requires pre-filing authorization—such as an application for permission to file a successive petition—simply taking steps to fulfill this requirement does not toll the statute of limitations. . . . Instead the second petition tolls the limitations period only if the state court grants permission to file it.") (internal citations omitted).

Montanez argues that grounds 1 and 9 "relate back" to his original § 2254 Petition, but the Court does not agree. Ground 1 alleges that the prosecutor's comments are closing violated his right to a fair trial (a ground he raised in his direct appeal). Ground 9 alleges that Montanez's right to confront the witnesses against him was denied when the trial court allowed one doctor to present to the jury the contents of another doctor's certified autopsy report. Neither of the grounds relies on any of facts relevant to the original grounds of relief (which are grounds two through eight in the amended petition). Grounds 2 through 6 relate to alleged *Brady* violations that do not relate to the comments at closing or testimony regarding the autopsy report. Ground 7 argues that Montanez's right to confront a different witness was violated and ground 8 raises an ineffective assistance of counsel claim regarding failure to impeach witnesses. Put simply Montanez's new grounds for relief are "supported by facts that differ in both time and type from those the original pleading set forth."

Montanez argues that because his federal habeas petition was stayed, the statue of imitations was stayed as well. (Doc. 19 at 19–20). However, "the filing of a petition for habeas corpus in federal court does not toll the statute of limitations." *Rhines*, 544 U.S. at 274–75. Likewise, a stay in federal habeas proceedings cannot toll the statute of limitations. Accordingly, the Court finds that grounds 1 and 9 are not timely under § 2244(d)(1)(A) .

Montanez also argues that ground 9 is based on the recent Supreme Court decision in *Smith v. Arizona*, 602 U.S. 779 (2024), which was decided on June 21, 2024. In ground 9, Montanez argues that he was denied his confrontation right when the trial court allowed a doctor to present the contents of another doctor's certified autopsy report. (Doc. 9 at 16–17, 36). In *Smith*, the Supreme Court clarified prior Confrontation Clause caselaw as it relates to out-of-court statements by forensic-testing experts. The Supreme Court held that "[i]f an expert . . . conveys

13

an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Smith,* 602 U.S. at 795. Accordingly, if the statement is also testimonial, it is barred by the Confrontation Clause. *Id.* at 800.

The Court presumes Montanez is attempting to argue that this claim relies on a new constitutional right as announced in *Smith,* making his claim timely under § 2244(d)(1)(C). For a claim to be timely under § 2244(d)(1)(C), a petitioner must demonstrate that he is relying on a new rule and that the Supreme Court has held that the rule is retroactive to cases on collateral review. *Tyler v. Cain*, 533 U.S. 656, 663 (2001). *Smith* was decided on direct appeal and the Supreme Court did not include any language indicating that it applies retroactively to cases on collateral review. Moreover, generally "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310 (1989). However, two types of new criminal rules can be retroactive: new substantive rules which "place[] certain kinds of primary, private individual conduct beyond the power of criminal law-making authority to proscribe," *id.* at 311, and "'watershed rules of criminal procedure,'" which are procedural rules "implicating the fundamental fairness and accuracy of the criminal proceeding," *Welch v. United States,* 136 S. Ct. 1257, 1264 (2016) (internal citations omitted). *Smith*, does not fall into either category. *Smith* addressed a procedural rule, not a substantive rule. And, *Smith's* holding clarifying the admissibility of forensic expert testimony is not the rare "watershed rule of criminal procedure." *See Edwards v. Vannoy*, 593 U.S. 255, 264 (2021) (noting that the exception is "exceedingly narrow and "in the 32 years since *Teague* . . .the [Supreme] Court has *never* found that any new procedural rule actually satisfies that purported exception"). *See also Rodriguez v. Warden*, No. 3:25-CV-238 DRL-SJF, 2025 WL 2620942, at *4 (N.D. Ind. Sept. 11, 2025) (holding that

*Smith* is not retroactive on collateral review and citing *Hisler v. Royce*, No. 1:21-CV-3676, 2025 WL 903847, 13 (E.D.N.Y. Mar. 25, 2025), and *Garcia v. Cain*, No. 1:24-CV-52-HSO, 2025 WL 1363109, 5 (S.D. Miss. May 9, 2025), which held the same). Accordingly, the Court finds that Montanez's ground 9 is not timely under § 2244(d)(1)(C).

Montanez also argues he has shown cause and prejudice for his failure to timely bring his claims. (Doc. 19 at 20). While the cause and prejudice analysis is not applicable to the statute of limitations, the Court liberally reads Montanez's arguments as raising the issue of equitable tolling. The Supreme Court has held equitable tolling is only available if the petitioner "shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida,* 560 U.S. 631, 649 (2010) (quoting *Pace v. Diguglielmo,* 544 U.S. 408, 418 (2005). The petitioner seeking the tolling has the burden of demonstrating both elements of the *Holland* test. *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016) (citing *Williams v. Buss*, 538 F.3d 683, 685 (7th Cir. 2008)). And, if either element is not met, the petitioner is not entitled to equitable tolling. *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 755–56 (2016). "Although not a chimera—something that exists only in the imagination, equitable tolling is an extraordinary remedy that is rarely granted." *Carpenter*, 840 F.3d at 870 (quotation marks omitted).

Here, Montanez argues that Respondent's motion to dismiss with leave to reinstate foreclosed Montanez's opportunity to amend as a matter of course. He further argues that he was not informed by Respondent that "he would be losing his right to amend his habeas petition as a matter of course." (Doc. 19 at 20). However, Montanez did not lose the right to amend his petition at all—in fact the Court allowed Montanez to *file* an amended petition. Montanez, like all petitioners, cannot amend his petition after the statute of limitations has passed to

15

include unrelated claims. Accordingly, the Court finds that Montanez has not identified any exceptional circumstances that would justify equitable tolling. Grounds 1 and 9 are dismissed as untimely.

**B**

Respondent next argues that grounds 1 and 3 through 9 are procedurally defaulted. The Court agrees that grounds 1, 3(b), 7, 8, and 9 are procedurally defaulted, but, as explained below, the analysis on grounds 3(a), 4, 5, and 6 is not as straight forward and the Court declines to dismiss these claims solely based on procedural default.

Federal courts can grant writs of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). However, prior to considering the merits of a petitioner's claims, federal courts "must consider which claims have been procedurally defaulted." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018). There are two types of procedural default: First, "[a] state prisoner can procedurally default a federal claim if he fails to 'fairly present' it 'throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings,'" *Clemons*, 845 F.3d at 819 (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)), and "it is clear that those courts would now hold the claim procedurally barred," *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). Accordingly, "[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," which in Illinois requires the petitioner to "include his claims in a petition for leave to appeal to the Illinois Supreme Court." *Snow*, 880 F.3d at 864 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–46 (1999)).

16

Second, procedural default occurs "where the state court declines to address a petitioner's federal claims because the petitioner did not meet state procedural requirements[.]" *Id.* (quoting *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016)). In order for procedural default to apply in this circumstance, the state court's rejection of a federal claim based on a procedural rule must be "both independent of the federal question and adequate to support the judgment." *Clemons v. Pfister*, 845 F.3d 816, 819 (7th Cir. 2017). Relevant here, under the Illinois Post-Conviction Hearing Act, a petitioner may assert claims for substantial violations of their constitutional rights at trial in a postconviction petition, but a petitioner is only allowed to file one postconviction petition as a matter of right. 725 ILCS 5/122-1(f). A petitioner may only file a successive postconviction petition if they are granted leave of court. *Id.* Courts may grant leave "if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure," *id.* 5/122-1(f), or if "the petitioner asserts a fundamental miscarriage of justice based on actual innocence," *People v. Robinson*, 2020 IL 123849, ¶ 42. A state court's denial of leave to file is "an adequate and independent state ground precluding federal habeas review." *Thomas*, 822 F.3d at 385.

"Procedural default may be excused . . . where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Snow*, 880 F.3d at 864 (quoting *Thomas*, 822 F.3d at 386). "[T]he miscarriage of justice exception applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *Wilson v. Cromwell*, 69 F.4th 410, 421 (7th Cir. 2023) (internal citations omitted).

17

### 1

The analysis for grounds 1, 3(b), 7, 8, and 9 are fairly straightforward. Montanez raised ground 1 in his direct appeal before the Illinois Appellate Court, but failed to include it in his PLA before the Illinois Supreme Court. Accordingly, ground 1 is procedurally defaulted for failing to present it through one full round of state court review. Moreover, Montanez has not argued any reason to find cause and prejudice for failure to raise these claim through all rounds of state court review, nor a miscarriage of justice, and the Court finds none apparent from the record.

Likewise, Ground 3(b), Montanez's claim that the prosecution violated *Brady* by failing to turn over the entire CPD file, is procedurally defaulted. His related claim regarding the entire CPD file was raised in his initial postconviction petition as count XXIII his amended petition filed in April 2016, but not included in his appeal. *See also Montanez*, 234 N.E.3d at 800. And, Montanez's attempt to litigate this issue in his successive petition did not cure the default. The state court did not allow leave to file, finding that he had not shown cause for failing to present it earlier. *Id.* ("Defendant cannot satisfy the cause prong of the test when he did, in fact, raise the specific claim he seeks to raise again in his successive petition.").

Montanez's default on ground 3(b) cannot be excused because he has not shown cause and prejudice, nor a miscarriage of justice regarding the entire CPD file. Montanez cannot show cause for failing to raise his claim regarding the entire CPD file because this claim was available and raised in his initial postconviction petition, but simply not pursued before the petition was denied. Montanez argues that he can show cause for his failure to raise this claim based on his postconviction counsel's failure to raise it in his postconviction direct appeal. However, there is no constitutional right to postconviction counsel, so errors of postconviction

counsel that led to the default of "claims in state court cannot constitute cause to excuse the default in federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 757 (1991); *see also Crutchfield v. Dennison*, 910 F.3d 968, 971 (7th Cir. 2018) (holding that the exceptions to *Coleman* as announced in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 429 (2013), do not apply to ineffective assistance of counsel claims brought in Illinois).

Montanez also argues ground 3(b) cannot be procedurally defaulted because he was *pro se* and was not allowed to see the CPD files (Doc. 19 at 7). This is an argument he raised in the PLA on his motion for leave to file a successive postconviction petition. The Illinois Supreme Court noted that after he filed his claim regarding the entire CPD file in April 2016, "[t]he record does not reflect *any* further action by defendant whatsoever with respect to the CPD file until *after* the dismissal of count XXIII [of his postconviction petition] when he then filed an ARDC complaint against Gorman in February 2018." *Montanez*, 234 N.E.3d at 801. Based on this timeline, the Illinois Supreme Court found that Montanez "cannot convincingly assert that his *pro se* status was an objective factor outside his defense that inhibited his ability to raise a *Brady* violation claim with respect to the entire CPD file when he raised the claim in count XXIII and then made no effort to access the CPD file prior to the dismissal of count XXII." *Id.* at 801–02. This Court comes to the same conclusion after reviewing the record: Montanez's *pro se* status did not excuse his default when he failed to take action on this known issue while his postconviction petition was still pending in the trial court.

Montanez's grounds 7 and 8 are also procedurally defaulted. Montanez relies on the same police report to support grounds 7 and 8 (as well as ground 3a). During his initial postconviction proceedings, Montanez obtained a copy of a Field Investigation Progress Report authored by Detective James Winston that recalls an interview with Hoyt and McDonnell. (Doc. 9 at 34; Doc. 9-1 at 56). The report states

that the subject was "Male/White Hispanic." (Doc. 9-1 at 56). It states that a male "fitting the same description from the first homicide was seen purchasing gas in two containers." *Id.*at 60. It also references the inventory numbers for the debris that was collected from the burned Chevy. In ground 7, Montanez argues that his right to confront witnesses was denied when defense counsel agreed to stipulate to Winston's testimony about collecting debris. In ground 8, Montanez argues that his counsel was ineffective for failing to use the contents of this report to impeach multiple witnesses.

However, Montanez raised a *Brady* claim based on this police report in his third amended post-conviction petition and his first motion for leave to file a successive post-conviction petition. The report was discussed at an August 21, 2018, hearing, when Montanez was told by the State that the report had been tendered to defense counsel during discovery. (Doc. 17-21 at 1772). At that hearing, Montanez disagreed with the State's claim that it had been turned over in discovery and he said that if it had, his attorney was ineffective. *Id.* at 1773–1774. Montanez was told by the trial court that he could "make whatever arguments [he] want[ed] with respect to that police report at the next court date," which was scheduled for September 17, 2018. *Id.* at 1779. However, as mentioned above, the third amended petition was filed after his petition had been denied; "these amendments were not sanctioned by the trial court [and] they were never ruled on." *Montanez*, 2022 IL App (1st) 191930, ¶ 41, n.3. Accordingly, for the purposes of this opinion, the Court will presume Montanez's first motion for leave to file a successive petition was his first opportunity to present these to the state court. However, Montanez's first motion for leave to file a successive petition also only argued a *Brady* claim based on this report.

When Montanez raised his confrontation clause and ineffective assistance of counsel claims based on this police report in his second motion for leave to file

a successive postconviction petition, the Illinois Appellate Court, relying on appellate counsel's motion to withdraw, found that he could not show cause for his failure to present his alternative claims based on this police report in his first motion for leave to file a successive post-conviction petition. *See* Doc. 17-15 at 15, 30. Accordingly, the Court finds that his claim was procedurally defaulted. And, for the same reasons that he could not show cause to excuse his default in state court, he cannot show cause here.

Finally, ground 9 was not raised in state court at all, making it plainly procedurally defaulted as well. In Montanez's reply, he states that he has shown cause and prejudice for his procedural default for ground 9, but arguments relate to whether his claim should be considered timely. (Doc. 19 at 21). He did not provide any explanation for his failure to raise these arguments in state court. The Court, therefore, also finds no basis to excuse his procedural default of ground 9.

In summary, grounds 1, 3(b), 7, 8, and 9 are dismissed as procedurally defaulted.

**2**

In the remaining grounds that Respondent argues are procedurally defaulted—grounds 3(a), 4 5, and 6—the analysis is not as simple. Montanez appears to have raised these grounds in motions for leave to file a successive petition through all three levels of state court review.[3] Respondent argues that the

---

[3] The Court notes it is disputed whether Montanez raised his *Brady* claim regarding the police report from the CPD basement files in Ground 3(a) in his PLA to the Illinois Supreme Court. Montanez included his claim regarding the police report in his first motion for leave to file a successive postconviction petition and on his appeal of the denial of leave to file to the Illinois Appellate Court, but his attorney failed to include it in his PLA to the Illinois Supreme Court. Nonetheless, Montanez claims he filed a *pro se* Supplemental PLA, (doc. 19 at 2–3), which he attaches to his reply, *id.* at 29–33. Montanez also attached a copy of the authorization for payment for paying for the mailing of his Supplemental PLA that was file stamped by the IDOC on August 3, 2022. (Doc. 19 at 34). The Supplemental PLA does raise the *Brady* claim about the police report. There is no record that the Illinois Supreme Court received this filing and/or ruled on it.

claims are still procedurally defaulted because his motions for leave to file successive postconviction petitions, were denied at all levels, which constitutes "an adequate and independent state ground precluding federal habeas review." *Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016). However, Montanez argues that because the state court denied leave to file his *Brady* claims under the prejudice prong of the postconviction statute's cause and prejudice test, it was not based on independent and adequate state grounds. Specifically, in denying the claims, the Illinois Appellate Court relied on *Brady* to find that the evidence was not material, thus Montanez could not establish prejudice.[4] The Seventh Circuit confronted this issue in *Snow*, and agreed that "[i]t is difficult to conclude that the state court's decision was based entirely on independent and adequate state grounds," because "[i]n concluding that Snow failed to demonstrate prejudice, the court noted that the claims failed the *Brady* materiality standard." 880 F.3d at 868.

---

However, as long as it was actually sent to the Illinois Supreme Court, the Court finds that Montanez did all that was necessary to present these claims to the state courts to prevent procedural default based on failure a failure to present his claims to the state courts. *See Kizer v. Uchtman,* 165 Fed. Appx. 465, 468 (7th Cir. 2005) (unpublished) (petitioner fairly presented his claim to the appellate court when he filed a supplemental *pro se* brief); *see also Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir. 1997) ("A petitioner may satisfy the exhaustion requirement by presenting his federal claim in a *pro se* supplemental brief, even if he has an attorney."); *U.S. ex rel. Thomas v. Gaetz,* No. 11 C 7743, 2013 WL 53988, at *8 (N.D. Ill. Jan. 2, 2013) (finding no procedural default where petitioner attempted to file a supplemental brief on his postconviction appeal, but refused permission to do so). Were the Court otherwise to find his claim could proceed, additional briefing may be required to determine what actually occurred. However, for purposes of this opinion, the Court will assume that Montanez could establish that he raised his claim in each level of state court in his first motion for leave to file a successive postconviction petition.

[4] Notably, in Montanez's ground 6, he argues that the State violated *Brady* when it failed to disclose that Amy Rehnstrom, the lab technician that testified regarding the DNA evidence, had been disciplined by the Illinois State Police for theft of overtime pay. The Illinois Appellate Court, relying on counsel's motion to withdraw in Montanez's second motion for leave to file successive post-conviction petition, agreed with counsel that there were not issues of arguable merit on appeal. Counsel's motion, in turn, discussed both the lack of prejudice and the lack of cause for bringing this claim in a successive petition. Since the record does not specify, the Court again will give Montanez the benefit of the ambiguity and presume it was dismissed for a lack of prejudice.

However, resolving this dispute is as unnecessary in this case as it was in *Snow.* The Court's evaluation for cause and prejudice to excuse procedural default in federal court review also parallels the components of a *Brady* claim. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004)(quoting *Strickler v. Greene,* 527 U.S. 263, 282 (1999) (noting that "coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes"). As discussed below, the Court finds that Montanez's claims fail to meet the *Brady* materiality standard. Accordingly, the Court declines to determine whether Montanez's grounds 3(a), 4, 5, and 6 are procedurally defaulted and will instead analyze them alongside Montanez's ground 2 (which all parties agree is a non-defaulted *Brady* claim).[5] *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## C

Finally, the Court turns to the merits of the *Brady* claims that Montanez raises in grounds 2, 3(a), 4, 5, and 6. In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A successful *Brady* claim has three components: "The evidence at issue

---

[5] Respondent's brief, only addressing procedural default and not addressing whether Montanez could have established cause and prejudice to excuse his default, did not address the merits of any of these claims. However, with the additional state court records provided by Respondent, the Court finds the record sufficiently clear to adjudicate these claims without additional briefing from Respondent. *See also Sanders v. Radtke,* 48 F.4th 502, 513 (7th Cir. 2022) (addressing a district court's summary dismissal of § 2254 petition and finding that given the record the district court had before it that the district court was able "to assess the merits of the state trial court's postconviction work without the need . . . for the State to file a response.").

must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Favorable evidence includes that which undermines a witness's credibility, *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (*citing Giglio v. United States*, 405 U.S. 150, 153–54 (1972)), but "the evidence must be for more than cumulative impeachment," *United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008). Evidence is material when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).

### 1

In Montanez's ground 2 he argues that the State failed to disclose to the defense that Ortiz testified with the expectation of receiving a plea bargain in her pending case. The state courts reached the merits of this argument, so the Court must determine if that decision is owed deference. Where a state court has adjudicated a petitioner's claims on the merits, pursuant to § 2254(d), "[a] federal court may grant a federal petition for habeas corpus only if the state court's ruling on the federal constitutional question 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Snow*, 880 F.3d at 863–64 (quoting 28 U.S.C. § 2254(d)); *see also Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (when a state court resolves a claim on the merits, "a federal habeas

court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). "[A] decision is deemed "contrary to" clearly established federal law if the state court reached 'a conclusion opposite to that' of the Supreme Court on a legal matter [ ] or if the state court arrived at an outcome in direct contradiction to a 'materially indistinguishable' case decided by the Supreme Court." *Gambaiani v. Greene,* 137 F.4th 627, 632 (7th Cir. 2025) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman v. Hardy,* 690 F.3d 811, 814 (7th Cir. 2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000). However, "federal courts are cautious to grant relief, reviewing state-court factual findings with a healthy dose of deference. . . . The proper inquiry focuses [ ] on whether the alleged factual error is beyond debate." *Gambaiani*, 137 F.4th at 632. In conducting this review, courts must "look to the last reasoned state court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Pierce v. Vanihel*, 93 F.4th 1036, 1044 (7th Cir. 2024) (internal quotations omitted).

This claim was raised in Montanez's initial postconviction review and the last reasoned decision was the Illinois Appellate Court's decision in *People v. Montanez*, 2021 IL App (1st) 191065-U. In that decision, the Illinois Appellate Court correctly recited the *Brady* standard, *id.* ¶ 38, makings its decision not contrary to clearly established Supreme Court precedent, *Gambaiani*, 137 F.4th at 632. Moreover, the court's decision did not unreasonably apply *Brady* to Montanez's claim. First, the Illinois Appellate Court found that Montanez's claim was not supported by the record because, while Ortiz pled guilty a month after Montanez's trial and received a plea offer at some point, there was no evidence that at the time

she testified at Montanez's trial that Ortiz had "receive[d] a promise of any kind regarding her own case prior to testifying. *Montanez*, 2021 IL App (1st) 191065-U, ¶ 40. Specifically, Ortiz had testified at Montanez's trial on April 16, 2012, that she had not received any promises before her testimony and planned to go to trial on her pending armed robbery case the following month. *Id.* ¶¶ 5–8. During postconviction proceedings, Montanez based his claim on the fact that Ortiz pleaded guilty to theft after his trial (on May 17, 2012), and on two undated notes from the prosecutor's file in Ortiz's case. *Id.* ¶¶ *28, 35.* However, neither of these undated notes showed that Ortiz obtained the deal before she testified. Accordingly, since Montanez has not shown that the evidence of Ortiz's plea agreement existed at the time of his trial, he has not shown that the government suppressed any information. *See also United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) (the "government cannot suppress evidence that does not exist at the time of the trial").

Further, the Illinois Appellate Court also reasonably concluded that Montanez's *Brady* claim failed because the evidence was not material. Montanez argues that Ortiz was the only witness that placed him in the car, making evidence that would impeach her material. But, the jury already had reason to disbelieve Ortiz, as it knew that Ortiz was in custody on an armed robbery charge and Montanez's attorney highlighted that she testified in her jail uniform. *Id.* ¶¶ 6–8, 46. See *Ervin*, 540 F.3d at 632 ("*Brady* does not extend to "[e]vidence that impeaches an already thoroughly impeached witness." (quoting *United States v. Kozinski,* 16 F.3d 795, 819 (7th Cir.1994)). Further, portions of Ortiz's testimony were corroborated by other witnesses. *Montanez*, 2021 IL App (1st) 191065-U at ¶ 47.

Additionally, the Illinois Appellate Court found that the State did not solely rely on Ortiz's testimony in establishing Montanez's guilt and there was strong enough evidence in the record to sustain confidence in the verdict. *Id.* In his reply,

26

Montanez argues that the Illinois Appellate Court misconstrued the evidence when it found that there was testimony at trial that Montanez was in the car other than Ortiz's. (Doc. 19 at 23–25). However, the Illinois Appellate Court did not suggest otherwise; instead it focused on the other evidence that established that *someone* else was involved and in the car and the strong evidence that Montanez was involved in burning the car and at the scene. *Montanez*, 2021 IL App (1st) 191065-U ¶¶ 47–50. The court reasonably concluded that "abundant evidence supported a finding that Montanez had purchased two cans of gasoline in order to burn the Caprice with Ramirez inside it." *Id.* ¶ 50. Notably, this evidence included Montanez's own admission that he bought two cans of gasoline from that gas station, albeit he claimed it was for a different purposes. Additionally, when purchasing this gasoline shortly after the murders, he had scratches on his face and neck; Ramirez had Montanez's DNA under her fingernails, and Montanez had burn scars when he spoke with police.

Even if Montanez had established that evidence of a plea deal had been suppressed, the Illinois Appellate Court's conclusion that the evidence was not material to Montanez's guilt was reasonable and certainly due deference. *See Mays,* 592 U.S. at 392 (clarifying that to obtain federal relief on a claim adjudicated on the merits in state court, the federal court must find that the state court "blunder[ed] so badly that every fairminded jurist would disagree"). Accordingly, Montanez's ground 2 is denied as well.

**2**[6]

In ground 3(a), Montanez argues that the State violated Brady by failing to turn over the police report form the CPD basement files. This was prejudicial,

---

[6] The Court also notes that if the State court's denial of Montanez's *Brady* claims in Grounds 3(a), 4, 5, and 6, is considered on the merits, pursuant to § 2254(d), "[a] federal court may grant a federal petition for habeas corpus only if the state court's ruling on the federal

Montanez claims, while McDonnell's trial testimony provided evidence that there was a second perpetrator, his statements summarized in the police report did not. (Doc. 9 at 23). Specifically, the report did not mention that McDonnell saw a flash of light in the car that led him to believe there were more people in the car and stated that McDonnell did not see the gray Chevy leave the scene." (Doc. 9-1 at 60). Whereas, at trial McDonnell gave a detailed account of the fight and stated that when he returned from grabbing a two-by-four he did see the Chevy driving away with the front passenger door open as it began to leave.

The Illinois Appellate Court, addressing the claim within the cause and prejudice analysis, found that Montanez had not established prejudice:

> McDonnell shed little to no light on whether defendant was involved in the murders of Villalobos and Ramirez. In other words, even assuming defendant could have impeached McDonnell on whether he saw a flash of light in the vehicle or whether he saw Villalobos's vehicle drive away, defendant would not have been exculpated nor would the evidence tend to show that there was only one perpetrator.

*People v. Montanez*, 2022 IL App (1st) 191930, ¶ 43.

The Court mostly agrees with this analysis. McDonnell's testimony did not specifically point to *Montanez's* involvement, but it did provide some support for there being a second perpetrator in the car. However, the evidence of a second perpetrator was strongly supported by Samhan's testimony that he saw a Chevy Caprice with blood on its driver's side door run a red light as a woman was being

---

constitutional question 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Snow*, 880 F.3d at 863–64 (quoting 28 U.S.C. § 2254(d)). Again, however, the distinction here is immaterial, as the Court finds these claims must be dismissed under either a deference review or a de novo review of the *Brady* materiality standard. Additionally, as for Grounds 4, 5, and 6, the Illinois Appellate Court only stated that they "agree with the conclusion that there are no issues of arguable merit on appeal," (doc. 17-15 at 15), making the record not entirely clear as to whether the entire analysis and findings from counsel's motion to withdraw were adopted by the Illinois Appellate Court. Accordingly, a de novo review will remove all confusion.

choked by a man in the back seat. And, it was also supported by Ortiz's testimony that Montanez and Luera were in the car with the victims when she got out. Moreover, the additional overwhelming evidence of Montanez's guilt, *see* II.C.a (describing DNA evidence, evidence of Montanez buying gasoline with scratch marks on his face and next, and burn scars at the time of his police interview), makes this minor impeachment evidence even less relevant. In short, the Court finds that the impeachment evidence Montanez highlights from the police report is not material to his guilt or innocence. Accordingly, the Court finds that ground 3(a) is meritless.

3

Next, in ground 4, Montanez argues that the State violated *Brady* when it failed to disclose a report that there were Caucasian hairs found on Ramirez's body. Montanez claims he did not know about the lab report with the evidence of Caucasian hairs until he received a FOIA request response in May 29, 2020. (Doc. 19 at 11). He argues that the evidence is material because he and Luera are not Caucasian and "the fact that Caucasian hairs were found on Ramirez is evidence pointing toward another individual, evidence that would serve to undermine confidence in [Montanez's] conviction." (Doc. 19 at 12). However, as the Illinois Courts noted in Montanez's request for DNA testing, "[a]t trial, the evidence established that Ramirez and five other people, including defendant, were in the vehicle on the night of the murders. Thus, it would not be surprising to discover another person's DNA near Ramirez." *People v. Montanez*, 2025 IL App (1st) 232292-U, ¶ 56. Moreover, the additional DNA evidence does not refute the fact that Montanez's DNA was found under Ramirez's fingernails, let alone the plethora of other evidence of Montanez's guilt already discussed in relation to his other *Brady* claims. This evidence was not material to Montanez's guilt or innocence, so Montanez's ground 4 is denied as well.

29

**4**

Next, in ground 5, Montanez alleges that the State failed to disclose that Inventory No. 10021697 did not pertain to Montanez's case. At trial, the charred debris in Inventory No. 10021697 was presented as a trial exhibit, along with stipulated testimony that it was found to contain gasoline. (Doc. 17-21 at R1376–78). Specifically, it was stipulated that Detective James Winston would testify that "[h]e collected charred debris from inside the [Chevy Caprice] and placed it in a sealed one quart paint can, which he inventoried under Chicago Police No. 10021697," and that he submitted the can to the Illinois State Police crime lab for analysis. *Id.* at R1377. Additionally, it was stipulated that an employ of the Illinois State Police crime lab would testify that re received this can, inventory No. 10021697, and that it was found to contain gasoline. *Id.* at R1377–78.

During his postconviction proceedings, Montanez filed a FOIA request with the Illinois State Police ("ISP") to receive a copy of the records related to Inventory No. 10021697, but did not receive a satisfactory response. Montanez then initiated a lawsuit, *Montanez v. Illinois State Police,* 2022MR17, in the Circuit Court for Sangamon County. In response to the complaint, the ISP asserted the affirmative defense that "Laboratory Case No. C02-037282 and Inventory No. 10021697 pertain to a person other than [Montanez] and the records associated with each are law enforcement records." (Doc. 9-2 at 45). The answer further states that Montanez's state court criminal case no. 02-CR-31134-01 was linked to Laboratory Case No. C02-036958, and that records responsive to that laboratory case were sent to Montanez. *Id.* The Court takes judicial notice of the available online docket in the FOIA state court proceedings and notes that they were voluntarily dismissed by Montanez on January 27, 2023.

As Montanez's counsel concluded in his appeal on his motion for leave to file a successive postconviction petition, "the ISP response does not indicate that

the charred debris does not pertain to Montanez; rather, it indicates that it may also pertain to a person other than Montanez." (Doc. 17-15 at 26). Notably, the police report discussing Inventory #10021697 and Laboratory Case #C02-037282 did not discuss Montanez as a suspect, making it likely that ISP simply did not connect Montanez with the Inventory in its records. In any event, Montanez did not develop the issue with ISP, having voluntarily dismissed his FOIA request.

Moreover, Montanez also attaches a police report regarding the murders that discusses Inventory #10021697 and Laboratory Case #C02-037282. *See* Doc. 9-2 at 29–32. And, at trial two stipulations also provided that a proper chain of custody was followed and that the inventory number did correlate the charred debris collected from the Chevy Caprice. Ultimately, the vague FOIA response on which Montanez bases his claim is insufficient to prove that Inventory No. 10021697 did not pertain to Montanez's case, and the Court finds he has not shown that evidence was suppressed. Accordingly, his *Brady* claim fails.

**5**

Finally, in ground 6, Montanez argues that the State violated *Brady* when it failed to disclose that Amy Rehnstrom, the lab technician that testified regarding the DNA evidence, had been disciplined by the Illinois State Police for theft of overtime pay. At trial, Rehnstrom testified to the DNA evidence that linked DNA Montanez's DNA to DNA found under Ramirez's fingernails. Accordingly, Montanez argues that her dishonesty with overtime "would call into question the quality of her work, and thus raising (in the minds of [Montanez's] jury), Rehnstrom's possible motive to testify falsely." (Doc. 19 at 13).

However, Montanez fails to meet the first prong of the *Brady* test for this claim because the evidence was not suppressed. While the prosecution may not have affirmatively disclosed the evidence, Montanez cannot show that "the evidence was not otherwise available to [him] through the exercise of reasonable

diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Rehnstrom was charged with and pled guilty to wage theft in 2004. Montanez's defense counsel could have easily discovered this conviction through a background check. Moreover, Rehnstrom's misconduct was also public knowledge as it had been discussed in published cases. *People v. Buckner*, 376 Ill. App. 3d 251, 254, 876 N.E.2d 87, 90 (2007) (holding that it was not error for the trial court to bar the defendant from cross-examining Rehnstron concerning the disciplinary actions against her). This misconduct would have been easily discoverable by the time of Montanez's trial in 2012. Accordingly, the Court finds that Montanez's ground 6 is without merit as well.

### III

Should Petitioner wish to appeal this decision, he must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This will hold true only when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (1995). Where a claim is resolved on procedural grounds, a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim *and* about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016). Here, the Court does not find that reasonable jurists could disagree that the Petitioner's claims are untimely, procedurally defaulted, entitled to deference under 28 U.S.C. § 2254(d), and/or meritless. The Court declines to issue a certificate of appealability.

### IV

The Clerk of Court is directed to enter judgment as follows: Petitioner Pierre A. Montanez's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

§ 2254 (Doc. 9) is DENIED. The Court DECLINES to issue a certificate of appealability. This case is CLOSED.

*It is so ordered.*

Entered on January 13, 2026.

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE